UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION


MICHIGAN ELECTRIC
TRANSMISSION COMPANY,

        Plaintiff,

                                 Case Number 10-10661-BC
v.                                Honorable Thomas L. Ludington

MIDLAND COGENERATION
VENTURE, LIMITED PARTNERSHIP,

        Defendant.
_____/


**OPINION AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS, DENYING
PLAINTIFF'S MOTION TO REMAND, DENYING AS MOOT PLAINTIFF'S MOTION
TO STAY, AND DIRECTING THE FILING OF BRIEFS**

       Plaintiff Michigan Electric Transmission Company ("METC") commenced this lawsuit in

Midland County Circuit Court on January 19, 2010, against Defendant Midland Cogeneration

Venture LP ("MCV") alleging the following claims under state law: (1) unjust enrichment; (2)

promissory estoppel; (3) quantum meriut; (4) breach of contract implied in fact; and, (5) breach of

contract.  METC seeks to recover over one million dollars in operation and maintenance expenses,

as well as to receive reimbursement for property taxes it has paid for the operation of electric

transmission equipment that enables MCV to transmit power generated by its power plant for

distribution.

       MCV removed the case to this Court on February 16, 2010, purporting to invoke this Court's

federal question subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1441.  MCV asserts that

METC is a public utility whose rates are subject to the jurisdiction of the Federal Energy Regulatory

Commission ("FERC") and regulation under the Federal Power Act ("FPA"), 16 U.S.C. §§ 791 et

seq.; and that METC's claims implicate substantial federal questions thereunder.

Shortly after removal, on February 23, 2010, MCV filed a motion to dismiss [Dkt. # 2] arguing, inter alia, that METC's claims are barred by the "filed rate" doctrine. METC filed a response to MCV's motion to dismiss [Dkt. # 9] on March 23, 2010; and MCV filed a reply [Dkt. # 16] on April 6, 2010.

Meanwhile, on March 18, 2010, METC timely filed a motion to remand for lack of subject matter jurisdiction [Dkt. # 7]. METC acknowledges that FERC's regulation of its rates may be relevant to a federal defense that may be argued by MCV, but contends that such a federal defense does not create federal question jurisdiction. MCV filed a response to METC's motion to remand [Dkt. # 12] on April 1, 2010; and METC filed a reply [Dkt. # 17] on April 15, 2010.

Finally, the same day that METC filed its motion to remand, it filed a motion to stay [Dkt. # 8], requesting that the Court resolve its motion to remand before considering the merits of MCV's motion to dismiss. The Court held a hearing on the pending motions on May 17, 2010. For the reasons explained hereafter, both MCV's motion to dismiss and METC's motion to remand will be denied, and METC's motion to stay will be denied as moot. In addition, the parties will be directed to brief the issue of whether this Court should defer, or must defer, to the primary jurisdiction of FERC to resolve all, or some, of the questions presented in this action.

I

The electric utility industry consists of three main vertical stages: "(1) power production, which is the generation of electricity; (2) the transmission of high voltage electric power from the points of generation to substations for conversion to delivery voltages; and (3) the distribution of low voltage electricity to individual homes and businesses." *See Town of Norwood v. New England*

*Power Co.*, 23 F. Supp. 2d 109, 112 (D. Mass. 1998) (citing *Town of Concord v. Boston Edison Co.*, 915 F.2d 17, 19-20 (1st Cir. 1990)). Historically, electric utilities were vertically integrated monopolies, meaning that "electricity generation, transmission, and distribution for a particular geographic area were generally provided by and under the control of a single regulated utility." *Midwest ISO Transmission Owners v. F.E.R.C.*, 373 F.3d 1361, 1363 (D.C. Cir. 2004). In addition, "consumers paid a single price for generation, transmission and distribution [because] services were 'bundled.'" *Id.* Generally, "[c]ompetition among utilities was not prevalent," *New York v. F.E.R.C.*, 535 U.S. 1, 5 (2002), and the industry was "subject to abuses of market power," *Morgan Stanley Capital Group Inc. v. Pub. Util. Dist. No. 1 of Snohomish County*, 554 U.S. - - - -, 128 S. Ct. 2733, 2737 (2008).

In recent decades, FERC has taken steps to increase competition and reduce market power abuses by electric utilities by exercising the regulatory authority granted it by the FPA. *See Snohomish*, 128 S. Ct. at 2740 (explaining that FERC "has sought to promote competition in those areas of the industry amenable to competition, such as the segment that generates electric power, while ensuring that the segment of the industry characterized by natural monopoly, namely, the transmission grid that conveys the generated electricity - cannot exert monopolistic influence over other areas"). Generally, the FPA governs "the transmission of electric energy . . . and . . . the sale of electric energy at wholesale in interstate commerce." 16 U.S.C. § 824(b)(1). Pursuant to the FPA, FERC has jurisdiction "over all facilities for such transmission or sale of electric energy," excluding local distribution and exclusively intrastate transmission. *Id.*

Pertinent to this case, § 203 of the FPA requires public utilities to obtain FERC's approval to sell facilities subject to FERC jurisdiction, and FERC must determine that such a sale is

"consistent with the public interest." *Id.* § 824b(a). Even more pertinent to this case, § 205 tasks FERC with ensuring that "[a]ll rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of the Commission . . . shall be just and reasonable." *Id.* § 824d(a). FERC has exclusive jurisdiction to review rates and charges to ensure that they are "just and reasonable." *See id.* §§ 824(b)(1), 824d(a), 824e(a); *AEP Tex. N. Co. v. Tex. Indus. Energy Consumers*, 473 F.3d 581, 584 (5th Cir. 2006) ("The Federal Power Act ('FPA') gives FERC exclusive jurisdiction to regulate the transmission and wholesale sale of electric energy in interstate commerce."); *Pub. Util. Dist. No. 1 v. Idacorp, Inc.*, 379 F.3d 641, 646 (9th Cir. 2004).

To give FERC the opportunity to evaluate the reasonableness of rates and charges, § 205(c) of the FPA requires all public utilities to file with FERC all tariffs, or "schedules showing all rates and charges for any transmission or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges." 16 U.S.C. § 824d(c). Public utilities must also file all contracts "which in any manner affect or are related to such rates, charges, classifications, and services." *Id.* No public utility may enforce any rates or charges or any contracts relating thereto until 60 days after it has publicly filed them with FERC, thereby giving FERC and any other interested parties an opportunity to review them." *Id.* § 824d(d).

The Supreme Court has emphasized that "[t]he statutory requirement that rates be 'just and reasonable' is obviously incapable of precise judicial definition," that FERC is "afford[ed] great deference . . . in its rate decisions," and that FERC "is not bound to any one ratemaking formula." *Snohomish*, 128 S. Ct. at 2738. Traditionally, FERC "reviewed and set tariff rates under the 'cost-of-service' method, which ensures that a seller of electricity recovers its costs plus a rate of return

to attract necessary capital." *Id.* Eventually, however, FERC began to approve "market-based" tariffs, which "simply state that the seller will enter into freely negotiated contracts with purchasers." *Id.* at 2741. Contracts entered under a market-based tariff need not immediately be filed with FERC, arguably because "the requirement has been satisfied by the initial filing of the market-based tariffs themselves." *Id.* at 2741. *But see id.* at 2746 (noting that FERC's "passive permission for a rate to go into effect does not constitute a finding that the rate is just and reasonable"). FERC permits a utility to operate under a market-based tariff, subject to ongoing reporting requirements, if it "demonstrates that it lacks or has adequately mitigated market power, lacks the capacity to erect other barriers to entry, and has avoided giving preference to its affiliates." *Id.* at 2741 (citation omitted).

In 1996, to encourage competition, FERC issued Order No. 888, which "required all transmission owning utilities to provide transmission service for electricity generated by others on the same basis that they provided transmission service for the electricity they themselves generated." *Midwest ISO*, 373 F.3d at 1363-64 (citing Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities, F.E.R.C. Stats. & Regs. 31036, 31635-36 (1996)). "To effectuate this introduction of competition, FERC required public utilities to 'functionally unbundle' their wholesale generation and transmission services by stating separate rates for each service in a single tariff and offering transmission service under that tariff on an open-access, non-discriminatory basis." *Id.* at 1364 (citations omitted).

In the same order, FERC encouraged "the development of multi-utility regional transmission organizations (RTOs)," which would "place[] control of the grid in one entity," to decrease inefficiencies caused by "segmentation of the transmission grid among different utilities." *Id.*

(citations omitted). FERC also encouraged the development of independent system operators ("ISOs") to "assume operational control of the RTOs - but not ownership - of the transmission facilities owned by its member utilities" thereby separating "operation of the transmission grid and access to it from economic interests in generation." *Id.* (quotations omitted). This has been termed "operational unbundling." *Id.* (citation omitted). While participation in an RTO remained voluntary, in 1999, through Order No. 2000, FERC more strongly encouraged participation by directing "transmission-owning utilities either to participate in an RTO or to explain their refusal to do so." *Id.* at 1365 (citation omitted).

Here, Defendant MCV owns and operates an approximately 1,560 megawatt gas-fired cogeneration facility located in Midland, Michigan ("MC-Facility"), which was largely constructed in the 1980s, and met FERC's requirements of a "qualified facility" under the Public Utilities Regulatory Policies Act of 1978 ("PURPA"). *See generally* 16 U.S.C. § 824a-3. PURPA was enacted to encourage the development of cogeneration facilities "in response to the energy crisis of the 1970s . . . to lessen the dependence of electric utilities on fossil fuels." *N. Am. Natural Res., Inc. v. Strand*, 252 F.3d 808, 809 (6th Cir. 2001). A "cogeneration facility" is "a facility which produces (i) electric energy, and (ii) steam or forms of useful energy (such as heat) which are used for industrial, commercial, heating, or cooling purposes." *See* 16 U.S.C. § 796(18)(A).

On July 17, 1986, MCV entered into a Power Purchase Agreement ("PPA") with Consumers Power Company ("Consumers"), through which Consumers purchased electric energy output from MCV's power plant.[1] Generally, long-term PPAs were "the primary vehicle to assure commercial

---

[1] Until 2006, Consumers, or an affiliate, owned a 49% interest in MCV, while several other companies, including Dow Chemical Company, owned the remaining 51%.

viability" of QFs, which "had to rely on electric utilities with which they were interconnected to purchase (and, if necessary, transmit to third parties) the power they generated." *See generally* Stephen L. Teichler, *Long-Term Power Purchase Agreements in a Restructured Electricity Industry*, 40 Wake Forest L. Rev. 677, 685-86 (2005). So long as "a QF desired to claim its PURPA rate benefits, it was entitled to receive payments for its power based on the purchasing utility's avoided cost." *Id.* at 686-87. State public utility commissions were charged with determining avoided costs, and in many cases, utilities became obligated to pay "inflated rates" to QFs for many years under a PPA because of "exaggerated assumptions by state utility commissions of future fuel shortages and skyrocketing prices." *Id.* at 688. In other instances, "state commissions turned to more market-friendly alternatives for determining avoided costs," and inflated rates were largely avoided. *Id.* at 690. In this case, the parties did not provide a copy of the PPA to the Court, nor describe its terms, although MCV represents that it was "amended in 2008 and remains in effect today." [Dkt. # 2, p.3 n.1].

At the time that Consumers and MCV entered the PPA, Consumers was primarily a vertically-integrated public utility, owning and operating power generating facilities and power distribution facilities. To implement MCV's delivery of energy to Consumers, MCV needed to connect certain transmission equipment to Consumers' transmission system. To this end, MCV and Consumers entered into a "Facilities Agreement" on July 8, 1988, effective as of November 30, 1987, which detailed the duties of each party in the construction, operation, and maintenance of the necessary transmission facilities and related equipment (referred to in the Facilities Agreement and herein as "Connection Facilities"). Notably, any disagreements arising on "major matters" concerning the Facilities Agreement were to "be settled in accordance with the provisions of Section

18 of the Power Purchase Agreement." F. Agmt. § 8.

The Facilities Agreement provided that MCV, as "Seller," was required "to provide and install as necessary" various specifically described power transformers, circuit breakers, disconnect switches, a ground grid, grounding switches, surge arresters, termination structures, metering transformers, potential transformers, billing meters, protective relaying, and a control house. F. Agmt. § 1.2. The Facilities Agreement provided that Consumers was to provide certain "existing facilities," including specifically described connecting circuits, circuit breakers, disconnect switches, potential transformers, termination structures, and control houses, *id.* § 1.3.1; and to provide certain "new or modified facilities," including specifically described connecting circuits, communications circuits, disconnect switches, potential transformers, protective relaying, a remote telemetry unit, plant CRT terminal equipment, and telephone circuits, *id.* § 1.3.2.

The Facilities Agreement estimated that Consumers' "total cost and expense incurred in providing the Connection Facilities" would be approximately $1.41 million and required MCV to fully reimburse Consumers for its costs and expenses, with the last payment due to Consumers on December 1, 1988. *Id.* § 1.5.1. The Facilities Agreement provided that "[e]ach [p]arty shall own the facilities provided by it," except that MCV agreed to convey the following to Consumers:

> two 345/138 kV autotransformers required by Subsection 1.2.1(a); two 138 kV motor operated disconnect switches and two 345 kV motor operated disconnect switches required by Subsection 1.2.1(c) for isolating the 345/13 kV autotransformers; six single-phase 345 kV voltage transformers and six singlephase 345 kV current transformers required by Subsection 1.2.1(h); billing meters and associated equipment required by Subsection 1.2.1(j); the 345 kV and 138 kV conductors which electrically connect Consumers' 345 kV lines to the 345 kV motor operated disconnect switches and to the 345/138 kV autotransformers and the 138 kV conductors which electrically connect the 345/138 autotransformers to the 138 kV motor operated disconnect switches and to the 138 kV bus in Sellers [sic] switchyard; two 138 kV breakers with associated current transformers required by Subsection 1.2.1(b) and single-phase manually operated disconnect switches (six per breaker) required by Subsection 1.2.1(c); and all incidental and appurtenant facilities including but not limited

-8-

to support structures and enclosures installed to provide transmission capacity for at least 95 megawatts of electric energy from the Connection Facilities provided by Consumers under Section 1.3 to the 138 kV electric system of Dow.

*Id.* § 1.6 (referred to in the Facilities Agreement and herein as "Conveyed Facilities").

According to the Facilities Agreement, Consumers was granted "sole authority and responsibility to operate the Connection Facilities required by Section 1.3, 'Consumers' Connection Facilities' and the billing metering installation provided by Seller under Section 1.2, 'Seller's Connection Facilities,' " *id.* § 3.1, whereas MCV maintained responsibility for inspecting, operating, maintaining, repairing, and replacing the Conveyed Facilities, *id.* § 1.6, and "Connection Facilities required by Section 1.2 (except for the billing metering installation)," *id.* § 3.2. Consumers was authorized, however, to "operate the Conveyed Facilities pursuant to Section 1.6 if Seller fails to do so." *Id.* § 3.1.

The Facilities Agreement required MCV to "reimburse Consumers for all direct and indirect costs and expenses (including property taxes) incurred by Consumers in owning and operating the Connection Facilities required by Section 1.3, 'Consumer's Connection Facilities ' " and the billing metering installation provided by Seller under Section 1.2, 'Seller's Connection Facilities.' " *Id.* It also required MCV to "reimburse Consumers for property taxes payable by Consumers on the Conveyed Facilities and any other direct or indirect costs incurred by Consumers in owning and operating the Conveyed Facilities pursuant to Section 1.6." *Id.* MCV was required to pay these "costs and expenses" on a monthly basis. *Id.* § 3.6; *see also id.* § 3.6.3 ("All payments shall be made payable to Consumers Power Company and shall be sent to Consumers Power Company, Attention: Treasurer, 212 West Michigan Avenue, Jackson, Michigan 49201, or by wire transfer to a bank designated by Consumers.").

The Facilities Agreement provided that it "shall inure to the benefit and be binding upon the successors and assigns of the respective Parties hereto." *Id.* § 10. However, the agreement also provided that it "shall not be transferred or otherwise alienated without the other Party's written consent, which shall not unreasonably be withheld. No assignment of this Agreement shall be valid unless the Power Purchase Agreement is also assigned in the same manner at the same time." *Id.*

The Facilities Agreement provided that it continues "in effect until both the Power Purchase Agreement and the Commitment Agreement are terminated under their respective provisions." *Id.* § 12. It further provided that if it was terminated, MCV "shall reimburse Consumers for any costs which are unpaid at the time of termination which were incurred by Consumers in providing, installing, relocating, operating and maintaining the Connection Facilities." *Id.* In its motion to dismiss, MCV further represents:

> This clause was modified when Consumers and MCV made minor amendments to the Facilities Agreement in 2009. Those amendments reference the 2008 amendment to the PPA and remove references to obsolete ancillary agreements. As amended, Section 12 calls for termination of the Facilities Agreement on the later of termination of the PPA or March 16, 2025.

[Dkt. # 2, p.3 n.2].

On October 13, 2000, Consumers and METC filed an application with FERC, seeking approval to transfer certain of Consumers' "Transmission Assets" to METC, "in exchange for the common stock" of METC. *See* Application for Authorization to Transfer Jurisdictional Transmission Assets to METC Pursuant to Section 203 of the Federal Power Act § III(D); *see also id.* § II(B) ("Upon consummation of the Transfer Transaction, [METC] will acquire a 100 percent ownership interest in the Transmission Assets and, thereafter, will be a 'public utility' subject to the

jurisdiction of [FERC] under Part II of the FPA.").[2]  Previously, on July 12, 2000, METC had been

organized as a Michigan corporation and wholly owned subsidiary of Consumers.  At that time,

METC did not yet "conduct any business or own any facilities used for the generation, transmission,

or distribution of electric energy."  *See id.* § II(B).[3]

In the application, Consumers and METC explained that the transaction was "consistent with

the public interest" because it would:

> (1) create a clear corporate separation between Consumers' transmission business and its
> generation/distribution business; and (2) create benefits to transmission customers beyond
> those contemplated by [FERC]'s functional unbundling requirements set forth in Order Nos.
> 888 and 889, and will ultimately facilitate the Applicants' compliance with Order No. 2000.

*Id.* § I (citations and footnote omitted).  Consumers and METC clarified that they were not yet

seeking approval of METC as "an entity that currently meets the minimum characteristics and

functions of an RTO which were established by the Commission in Order No. 2000," and requested

that the instant application not be conditioned on such compliance.  *Id.*[4]

The application noted that FERC had authorized Consumers to transact wholesale sales of

electric energy and power at market-based rates, *id.* § II(A) (citing 85 F.E.R.C. 61121 (1998)); and

that Consumers had an approved open access transmission tariff on file with FERC ("OATT"), and

---

[2]  The application approximated the "purchase price" for the Transmission Assets to be $274.4 million.  *Id.* § IV(G).

[3]  The parties indicated at hearing that subsequently, in October 2006, METC became a subsidiary of ITC Holdings Corporation when the latter corporation purchased METC from TransElect for approximately $600 million.  ITC Holdings is a public utility that owns the transmission lines formerly owned by Consumers and other public utilities.  Consumers spun off its transmission lines in April or May 2002, and METC became a subsidiary of TransElect at that time.

[4]  The parties have noted that for a number of years now, MCV and Consumers have sold excess output from the MC-Facility into the Midwest ISO, and that METC integrated its transmission facilities into the Midwest ISO in 2002.

another open access transmission tariff filed jointly with Detroit Edison ("JOATT"). *Id.* Consumers and METC anticipated that METC would file amendments to the OATT and JOATT to substitute METC as the transmission provider under those tariffs. *Id.* § III(A)(2). As a result, Consumers would then "function solely as a generation and distribution company taking service under [METC]'s FERC-jurisdictional open access transmission tariffs." *Id.*

Consumers and METC represented that "transmission customers will see no difference in the level or quality of service that they currently receive," and that there would be no "change in the rates for transmission service paid by Consumers' existing bundled retail customers, and its wholesale transmission customers . . . because [METC] will charge such customers the same rates as are currently in effect under Consumers' OATT and the JOATT." *Id.* The application provided that "[u]pon receipt of the required regulatory approvals," METC would began providing transmission service. *Id.* § III(C). More specifically, Consumers and METC explained:

> Shortly after the filing of this Application, [METC] will make a ministerial filing under FPA Section 205 seeking approval for [METC] to provide service under its own OATT. The OATT filed for [METC] will be virtually identical in all material aspects to Consumers' currently filed and FERC-approved OATT and will include the same OATT rates charged by Consumers. In addition, [METC] will also make a similar ministerial filing under Section 205 of the FPA to amend the JOATT between . . . Detroit Edison . . . and Consumers Energy.

*Id.* The application provided that METC "will provide open access, non-discriminatory transmission service pursuant to the [METC] OATT and/or JOATT, and will credit to Consumers all charges billed to and collected from wholesale customers for such use of the Distribution Facilities." *Id.* § III(B). A *pro forma* operating agreement between METC and Consumers was attached to the application.

The application further represented that METC would "assume the existing rights, obligations and liabilities of Consumers associated with the Transmission Assets and the conduct

of Consumers' transmission business." *Id.* § III(D). The Transmission Assets were described as all of Consumers' "integrated transmission facilities with voltage ratings of 120 kilovolts ('kV') and above, as well as all related tariffs, contracts, books and records." *Id.* § I. An attachment to the application listed the Transmission Assets, and a map identified their locations. In response to MCV's motion to dismiss, METC represents that the map depicts MCV's substation as a "Transmission Substation" to be transferred from Consumers to METC. In addition, the application explained that the Transmission Assets are listed in the attachment, but that

> [t]he assets to be transferred also involve general and intangible plan assets associated with Consumers' transmission operations, including plant materials, inventory, and operating supplies. In addition, the Transmission Assets include all tariffs, service agreements, books, and records which will be necessary for [METC] to provide transmission service under the terms of the [METC] OATT and/or JOATT, and otherwise assume Consumers' rights and obligations as a transmission provider.

*Id.* § IV(F).

Notice of the proposed transfer of the Transmission Assets from Consumers to METC was published in the Federal Register on November 24, 2000, at 65 Fed. Reg. 70560, and several entities intervened in the case, including entities raising concerns about the proposed transfer's affect on contractual obligations. *See Consumers Energy Co.*, 94 F.E.R.C. 61018 (2001). MCV did not intervene in the FERC proceedings or file comments or objections. *See id.*

On January 10, 2001, FERC approved the "proposed transfer of Consumers' jurisdictional facilities described in the application." *Id.* FERC's order particularly noted that on November 13, 2000, Consumers and METC "filed an application under Section 205 of the FPA to transfer the bulk of Consumers' existing . . . OATT . . . to [METC] to become effective on the date Consumers' transmission assets are transferred to [METC]." FERC authorized "the disposition of the transmission assets as consistent with the public interest," and "the transfer of the relevant OATT

sections to [METC]," and "accept[ed] them for filing by [METC]."  The order expressly noted that "[t]he transmission assets include substantially all of Consumers' integrated transmission facilities with voltage ratings of 120 kV and above . . . and all related jurisdictional transmission tariffs, contracts, books and records."

METC asserts that the Facilities Agreement was included in the transaction, and transferred from Consumers to METC, because it was a contract related to the Connection Facilities.  Indeed, METC contends that it became the owner and operator of MCV's substation, and that it was the only entity that had the responsibility and ability to provide the interconnection service necessary for MCV to sell its electrical output.  In contrast, MCV highlights that Consumers and METC's application submitted to FERC did not specifically identify the Facilities Agreement in Attachment 1, which purported to list the transferred assets.

MCV further emphasizes that the Facilities Agreement provided that it "shall not be transferred or otherwise alienated" without MCV's written consent, and that assignment of the agreement was not valid unless the PPA was "also assigned in the same manner at the same time." *See* F. Agmt. § 10.  It is undisputed, albeit without explanation, that the PPA was not within the scope of the FERC order approving the transfer of assets.  Rather, METC and Consumers entered into an agency agreement whereby METC agreed to act as Consumers' agent with respect to performing Consumers' transmission-related obligations under the Facilities Agreement.

METC and Consumers entered the Agency Agreement on April 1, 2001; which was deemed to "continue as long as the Subject [Facilities] Agreement remains in effect, but shall terminate on a coincidental basis with the Subject Agreement."  Agency Agmt. Art. V.  By way of introduction, the agreement recites:

WHEREAS, . . . As of April 1, 2001, METC owns all of the Consumers' Connection Facilities described in Section 1.3 of the Subject Agreement and the portion of Seller's Connection Facilities described in Section 1.2 of the Subject Agreement which Seller conveyed to Consumers pursuant to Section 1.6 of the Subject Agreement, except for the billing meters and associated equipment and devices (specified pursuant to Section 1.2.1(j) of the Subject Agreement) for metering the two 138 kV circuits serving The Dow Chemical Company ("Dow Metering Equipment"). This Agency Agreement refers to those Connection Facilities previously owned by Consumers, exclusive of "Dow Metering Equipment", as the "Conveyed MCV Interconnection Facilities;" and

WHEREAS, the Conveyed MCV Interconnection Facilities are among the transmission assets transferred to METC effective as of April 1, 2001 pursuant to authorizations and approvals granted by [FERC] . . . on January 10, 2001; and

WHEREAS, pursuant to the same FERC authorization noted in the preceding recital, Consumers is to transfer to METC "all related jurisdictional transmission tariffs, contracts, books and records"; and

WHEREAS, Section 10 of the Subject Agreement provides that "No assignment of this Agreement shall be valid unless the Power Purchase Agreement ("PPA") is also assigned in the same manner at the same time"; and

WHEREAS, the aforementioned PPA is not a transmission asset; Consumers has no desire to transfer the Power Purchase Agreement to METC; and thus it is not being assigned by Consumers to METC; and

WHEREAS, Consumers nevertheless has certain ongoing transmission related obligations under the Subject Agreement that it desires METC to perform commencing as of April 1, 2001; and

WHEREAS, for purposes of interpreting and applying this Agency Agreement, subsequent owner(s), assignee(s) or other transferee(s) of all or any material part of the Conveyed MCV Interconnection Facilities and METC and its successors, assigns, and owners, and regardless of whether the underlying transactions are structured and accomplished as a membership interest purchase, stock purchase, an asset purchase, a combination of the foregoing or otherwise, are each regarded as a "Downstream Owner" . . .

*Id.* Intro.

The agreement provides that as of April 1, 2001,

METC agrees to accept the duties and obligations set forth in this Article II with respect to the Subject Agreement and without any additional compensation from Consumers other than (i) indemnity payments, if any, that may become due to Downstream Owner under Article IV, Section 1 and (ii) payments received from Consumers pursuant to Article III of this Agency Agreement.

*Id.* Art. II. The scope of the "duties and obligations" is described as follows:

> As Consumers' agent, Downstream Owner shall fulfill Consumers' operating responsibility under the Subject Agreement and is hereby delegated the full scope of operating authority Consumers possesses under the Subject Agreement subject to the qualifications stated in the final sentence of Section 3[5] above and in the sentence that next follows. Recognizing that Section 3.1 (as well as Section 3.4) obligates Seller to reimburse Consumers for all direct and indirect costs and expenses (including property taxes) incurred in owning and operating Consumers' Connection Facilities, the billing metering installation provided by Seller under Section 1.2, and the Conveyed Facilities, METC and Consumers herein agree to cooperate with one another in the preparation of (a) an estimate of such costs and expenses for each ensuing calendar year and (b) the invoices necessary for recovery of such costs and expenses from Seller on a timely basis, in accordance with Section 3.1, Section 3.4 and Section 3.6.1 of the Subject Agreement.

*Id.* Art. II, § 4.

Pursuant to Article III, "Consumers shall pay, and METC or other Downstream Owner, shall accept and receive, as compensation and reimbursement, an agency fee equal to $500.00 per month." In addition, "METC or other Downstream Owner shall be entitled to the payments from Seller pursuant to the Subject Agreement." *Id.* To facilitate Seller, or MCV's payments to "METC or other Downstream Owner," the agreement required Consumers to "designate to Seller a bank and an account therein in the name of Downstream Owner, both as chosen by Downstream Owner, as the place to which payments of the invoices rendered shall by sent by wire transfer by Seller." *Id.* Art. II, § 4. Finally, METC was required to "keep Consumers informed on a regular basis of the status of payments received from Seller, as well as those invoices outstanding or being contested in any way by Seller." *Id.*

MCV suggests that neither Consumers nor METC informed FERC of the restriction on transfer of the Facilities Agreement or of their effort to "circumvent" that restriction through the

---

[5] The final sentence of Section 3 provides that "Consumers is not delegating and expressly retains all rights and obligations under the Subject Agreement relating to the Dow Metering Equipment."

Agency Agreement. MCV argues that both the Agency Agreement and the Facilities Agreement were required to be filed with FERC because they are contracts related to the sale or transmission of electricity in interstate commerce. MCV also asserts that neither Consumers nor METC sought FERC's approval to give METC operational control over facilities operated by Consumers, but owned by MCV. Such facilities could not be encompassed within the scope of the § 203 Application authorizing the transfer of the Transmission Assets to METC because they were not owned by Consumers. METC challenges MCV's assertion that any of the Connection Facilities are or were owned by MCV rather than Consumers.

Nonetheless, since April 1, 2001, METC has been performing all of the operation and maintenance on the Connection Facilities, as well as paying all property taxes related to the Connection Facilities. From April 2001 to February 2005, MCV paid METC for all direct and indirect costs and expenses, including property taxes, associated with the operation of the Connection Facilities. While METC continues to incur costs for the Connection Facilities, MCV stopped paying METC in February 2005.

At hearing, MCV suggested that FERC generally does not approve agreements requiring generators such as MCV to reimburse transmission providers like METC for property taxes. Beginning with Order No. 2003, FERC required the use of a *pro forma* Large Generator Interconnection Agreement ("LGIA"), which MCV contends does not require generators to reimburse transmission providers for property taxes. FERC has explained that "the use of *pro forma* documents ensures that Interconnection Customers are treated on a just and reasonable and not unduly discriminatory basis," and "streamlines the interconnection process by eliminating the need for an Interconnection Customer to negotiate each individual agreement." *Pacific Gas & Elec. Co.*,

128 F.E.R.C. 61175. Nevertheless, some generators reimburse transmission providers for property taxes because FERC allows deviation from the *pro forma* LGIA for "extraordinary interconnections where reliability concerns, novel legal issues or other unique factors would call for non-conforming agreements." *Id.* In addition, some generators are required to reimburse transmission providers for property taxes as a result of grandfathered agreements that were submitted to FERC before the most recent *pro forma* LGIA was in place.

## II

In considering a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, "[t]he court must construe the complaint in a light most favorable to the plaintiff, and accept all of [the] factual allegations as true." *Bloch v. Ribar*, 156 F.3d 673, 677 (6th Cir. 1998). Yet, to survive a Rule 12(b)(6) motion, a plaintiff's complaint "must contain either direct or inferential allegations respecting all the material elements [of the claim] to sustain a recovery under some viable legal theory." *First Am. Title Co. v. Devaugh*, 480 F.3d 438, 444 (6th Cir. 2007) (quotation omitted). *See also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009); *Twombly v. Bell*, 550 U.S. 544, 555 (2007) (explaining that a complaint must contain something more than a statement of facts that merely creates speculation or suspicion of a legally cognizable cause of action). "When a court is presented with a Rule 12(b)(6) motion, it may consider the [c]omplaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to the defendant's motion to dismiss, so long as they are referred to in the [c]omplaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

In its motion to dismiss, MCV contends that METC's complaint should be dismissed for two

main reasons. First, MCV argues that METC's claims are barred by the "filed rate" doctrine because the Facilities Agreement was not filed with FERC, as required by the FPA. Second, MCV contends that METC lacks standing to bring claims against MCV because Consumers is not able to "assign" its duties and obligations under the Facilities Agreement absent contemporaneous assignment of the PPA and MCV's consent.

As a threshold issue, in its motion to remand, METC contends that federal question subject matter jurisdiction does not exist over its complaint because FERC's regulation of METC's rates is not relevant to its "well-pleaded complaint." *See Roddy v. Grand Trunk W. R.R. Inc.*, 396 F.3d 318, 322 (6th Cir. 2005) ("Only state-court actions that originally could have been filed in federal court may be removed to federal court by the defendant.") (quoting *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392 (1987)). METC maintains that it does not assert that MCV has violated a federal law, nor do any of METC's state common-law claims rely upon any federal law as a basis for relief. METC insists that the filed rate doctrine only presents a federal "defense," which does not provide a basis for federal district court jurisdiction. Importantly, MCV, as the removing party, bears the burden of establishing federal subject matter jurisdiction, and "all doubts as to the propriety of removal are resolved in favor of remand." *Coyne v. Am. Tobacco Co.*, 183 F.3d 488, 493 (6th Cir. 1999).

As will be explained below, federal jurisdiction exists in this case because METC's complaint raises a "substantial federal question." While the jurisdictional question is necessarily resolved prior to consideration of MCV's motion to dismiss, analysis of the motion to dismiss will be presented first, to provide necessary context for the jurisdictional question.

III

First, as previously mentioned, MCV contends that METC's complaint should be dismissed because METC's claims are barred by the "filed rate" doctrine. Second, MCV contends that METC's complaint should be dismissed because METC lacks standing to pursue its claims when the Facilities Agreement imposes contractual obligations only as to Consumers and MCV. Each of these two main arguments will be addressed in turn.

A

The "filed rate" doctrine prohibits a public utility from charging for its services other than in compliance with the rates and conditions filed with the appropriate federal regulatory authority – in this case, FERC. *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 577, 581 (1981) ("[U]nder the filed rate doctrine, the Commission alone is empowered to make that judgment [as to the reasonableness of rates], and until it has done so, no rate other than the one on file may be charged."). In granting this authority to FERC, "Congress withheld the authority to grant retroactive rate increases or to permit collection of a rate other than the one on file." *Id.* at 580.

The refusal to allow recovery when there are no approved rates or contractual terms is designed in part to safeguard the statutory authority of regulatory agencies. *See Qwest Corp. v. Scott*, 380 F.3d 367, 375 (8th Cir. 2004); *MCI Telecomm. Corp. v. Ohio Bell Tel. Co.*, 376 F.3d 539, 547-48 (6th Cir. 2004) (noting that the filed rate doctrine "preserves the role of administrative agencies in approving and setting rates"). The filed rate doctrine not only "prevents . . . judicial rate-setting," it also "precludes any judicial action which undermines agency rate-making authority." *Marcus v. AT&T Corp.*, 138 F.3d 46, 61 (2d Cir. 1998); *Hill v. Bellsouth Telecomm. Inc.*, 364 F.3d 1308, 1317 (11th Cir. 2004) (finding that any award of damages that would effectively result in a

-20-

judicial determination of the reasonableness of a rate is prohibited under the filed rate doctrine).

While the filed rate doctrine often arises in situations where the plaintiff seeks damages that are measured by some standard other than the charges approved by a regulator, the filed rate doctrine may also preclude a utility from seeking recovery when there is no contract on file. *See, e.g.*, *Union Tel. Co. v. Qwest Corp.*, 495 F.3d 1187, 1193 (10th Cir. 2007) (finding that the plaintiff's failure to file tariffs for wireless services barred its state law claims); *BP W. Coast Prods., LLC v. F.E.R.C.*, 374 F.3d 1263, 1274 (D.C. Cir. 2004) ("The Commission may not regulate rates as if they existed in a world that never was.  It must take the rates as it finds them, and here, FERC found them unfiled."); *AT&T Corp. v. JMC Telecom, LLC*, 470 F.3d 525, 532 (3d Cir. 2006) (refusing to enforce a discount rate to the defendant because the contract was never filed with the FCC).

The filed rate doctrine not only prohibits public utilities from charging according to unapproved rates or contractual terms, it also prevents courts from awarding damages on unfiled terms.  "It would surely be inconsistent with this congressional purpose to permit a state court to do through a breach-of-contract action what [FERC] itself may not do."  *Ark. La. Gas Co.*, 453 U.S. at 580.  As a result, courts faced with state law claims that seek damages based on contractual terms and conditions not filed with, or otherwise approved by, the relevant regulator must dismiss those claims.  *See, e.g.*, *Freightcor Servs., Inc. v. Kuhlman Corp.*, 30 F.3d 43, 44-45 (6th Cir. 1994) (affirming that carrier's failure to file required participation documents with federal agency barred its suit against customer for undercharges); *Keyspan-Ravenswood, LLC v. F.E.R.C.*, 474 F.3d 804, 809 (D.C. Cir. 2007) (holding that FERC erred in allowing an independent electrical system operator to charge a different rate than that on file because the operator never filed the supporting documents that would justify a different rate).

The state law claims barred by the filed rate doctrine are not limited to breach of contract actions. "Under the filed tariff doctrine, courts may not award relief (whether in the form of damages or restitution) that would have the effect of imposing any rate other than that reflected in the filed tariff." *Firstcom, Inc. v. Qwest Corp.*, 555 F.3d 669, 680 (8th Cir. 2009) (quotations omitted) (dismissing fraud and promissory estoppel claims). While dismissal of claims may appear inequitable at times, the U.S. Supreme Court has recognized that the filed rate doctrine "is undeniably strict and it obviously may work hardship in some cases, but it embodies the policy which has been adopted by Congress." *Maislin Indus., U.S. Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 127 (1990); *see also Rebel Motor Freight, Inc. v. Interstate Commerce Comm'n*, 971 F.2d 1288, 1293 (6th Cir. 1992); *H.J. Inc. v. Nw. Bell Tel. Co.*, 954 F.2d 485, 488 (8th Cir. 1992) (noting that "the underlying conduct does not control whether the filed rate doctrine applies. Rather, the focus for determining whether the filed rate doctrine applies is the impact the court's decision will have on agency procedures and rate determinations.").

Here, MCV and METC appear to agree that the obligation to file contracts extends to the Facilities Agreement, because FERC requires public utilities to file contracts "involving the installation, operation or use of facilities for the transmission or delivery of power at wholesale in interstate commerce." Prior Notice and Filing Requirements Under Part II of the Federal Power Act, 64 F.E.R.C. 61139 (1993) [hereinafter "Prior Notice Order"]. MCV further contends that METC was required to file the Agency Agreement because it grants METC extensive operating authority over the Connection Facilities. *See* Agency Agmt. § II(4).

In light of the fact that neither the Facilities nor Agency Agreement was filed, and the strict nature of the filed rate doctrine, MCV argues that METC's claims are barred even if METC

provided services for which it has not been paid or incurred costs that MCV has not reimbursed. MCV also contends that METC cannot obtain relief on the assumption that FERC would not have objected to the terms of the Facilities and Agency Agreements if the contracts had been earlier filed with the agency, citing *Ark. La. Gas Co.*, 453 U.S. at 578-79 (noting that the plaintiffs' request for damages "amounts to nothing less than the award of a retroactive rate increase based on speculation about what the Commission might have done had it been faced with the facts of this case").

METC raises two main arguments in response. First, METC argues that FERC approved the transfer of Consumers' transmission assets to METC, including the Connection Facilities and the Facilities Agreement in January 2001. METC suggests that FERC implicitly approved the Facilities Agreement because it was a contract related to the Connection Facilities transferred to METC.

In reply, MCV argues that FERC's approval of Consumers and METC's § 203 Application does not imply a finding under § 205 that the rates in the Facilities Agreement are "just and reasonable," citing *PSI Energy, Inc.*, 63 F.E.R.C. 61107, 1993 WL 125463 (1993). In *PSI Energy*, FERC concluded that, subsequent to a § 203 request for authorization to sell transmission facilities, "PSI assumed a needless risk by failing to file the agreements under section 205 – or obtaining Commission guidance – in advance of the commencement of service thereunder." 1993 WL 125463, at *5. Ultimately, however, FERC "accept[ed] PSI's submittal for filing and waive[d] the prior notice requirement to permit the three agreements to become effective in accordance with their terms, without any requirement that PSI make refunds." *Id.* at *6. MCV further suggests that "typically," FERC expressly states when it finds rates in a facilities agreement to be just and reasonable, if it does in fact reach that conclusion.

METC's second argument in response to the motion to dismiss is that even if the agreement

was not timely filed with FERC, such a circumstance only affects the amount that METC can collect under the agreement. METC emphasizes that FERC has explicitly stated that it is not its "intention to promote a policy that . . . imposes a regulatory minefield for the unwary and creates business opportunities for the legally clever." Prior Notice Order, 64 F.E.R.C. at 61977. To avoid customers receiving a "windfall" from a refund due to the late filing of a rate, FERC "lessen[ed] the severity of [its] refund policy" when "the customer has actual notice of and agrees to the late filed rate." *Id.* at 61979.

FERC explained that "[i]f a utility files an otherwise just and reasonable cost-based rate after new service has commenced, or if waiver is denied and the proposed rate goes into effect after service has commenced, we will require the utility to refund to its customers the time value of the revenues collected . . . for the entire period that the rate was collected without Commission authorization." *Id.* (footnotes omitted). *See also Niagara Mohawk Power Corp.*, 123 F.E.R.C. 61143 (2008) (concluding that an agreement was "just and reasonable," but requiring the utility to refund the time value of the money collected under the agreement that should have been filed ten years prior). Similarly, if a public utility is late in filing a market-based rate, the utility is required to refund both the time value and "all revenues resulting from the difference, if any, between the market-based rate and a cost-justified rate," and is "able to charge only a cost-justified rate for the remainder of that contract's term." Prior Notice Order, 64 F.E.R.C. at 61980.

In reply, MCV emphasizes that FERC also stated that "we see no excuse for failing to file all agreements under which jurisdictional service is being provided." *Id.* at 61978. In at least one case, FERC determined that a public utility's failure to file a service agreement implicated the filed rate doctrine. *See Carolina Power & Light Co.*, 87 F.E.R.C. 61083, 61356-57 (1999). FERC

explained that "imposing a refund promotes the purposes of the filed rate doctrine." *Id.* at 61356. FERC also recently affirmed that rates charged in a private contract subject to its jurisdiction "will not be legal rates unless filed" with FERC. *SFPP, L.P.*, 122 F.E.R.C. 61126, 61650 (2008). Thus, MCV contends that until FERC has the opportunity to assess whether the rates in the Facilities Agreement are just and reasonable, the agreement is unenforceable in court.

Importantly, METC does not dispute that the Facilities Agreement is required to be filed with FERC. METC simply contends that it was adequately "filed" during the § 203 process resulting in the approval of the transfer of the Transmission Assets from Consumers to METC. It is not outside the realm of plausibility that METC is correct. At this juncture, MCV has not advanced sufficient legal authority or adequately explained how there is no *plausible* set of factual circumstances under which the Facilities Agreement could be deemed "filed," even if METC did not separately file it at the time that the Transmission Assets were transferred to METC from Consumers. *See Iqbal*, 129 S. Ct. at 1949-50. In other words, METC could be entitled to relief under some "viable legal theory." *First Am. Title Co*, 480 F.3d at 444.

While MCV advances the general proposition that FERC's approval of a § 203 application does not amount to approval of related rates as "just and reasonable," MCV has not addressed the particular circumstances of this case. Absent is any explanation as to whether Consumers ever filed the Facilities Agreement and whether that could be sufficient to constitute filing by METC, as METC is the successive owner of the Transmission Assets and FERC approved the transfer of all related contracts. METC and Consumers specifically represented in the § 203 Application that Consumers' customers would not be subject to any rate changes despite the change as to the service provider. Further, its is not clear whether the OATT filed by METC, referred to in the § 203

application and FERC's approval order, is relevant to this case, and whether FERC's approval of the OATT has any implications as to whether the Facilities Agreement had to be separately filed. Presumably, the OATT allows METC to enter contracts for market-based rates, which do not need to be immediately filed with FERC. The timing of when such a contract must be filed has not been addressed. Nor has it been addressed whether the Facilities Agreement could be considered a "grandfathered" agreement, exempt from further filing requirements, because it was executed prior to the transfer of the Transmission Assets from Consumers to METC.

Significantly, to this point, there is no indication that METC seeks to recover anything other than what it considers to be the filed rate as propounded in the Facilities Agreement. While it is true that it could ultimately be determined that the rate in this case is "unfiled" and therefore unenforceable, that conclusion cannot yet be reached. Thus, the filed rate doctrine does not bar METC's claims at this time. *See, e.g.*, *Bd. of Pub. Works, City of Blue Earth, Minn. v. Wis. Power & Light*, 613 F. Supp. 2d 1122, 1130 (D. Minn. 2009) (emphasizing that the filed rate doctrine "does not oust this Court of jurisdiction to interpret contracts and construe statutes to the extent that such action is not rate setting") (quotations omitted).

However, if it is later determined that there is in fact no "filed rate," then such a conclusion likely implicates the filed rate doctrine because METC will be seeking relief that falls within FERC's exclusive rate setting jurisdiction. While METC insists that a conclusion that the agreement was not filed would only affect the remedy to which it is entitled, that does not appear to be completely accurate. Indeed, it would seem that this Court would be required to determine the appropriate rate, which necessarily must be "just and reasonable," that METC could recover. Nevertheless, neither FERC nor this Court have yet found that the rate is not properly filed and

enforceable and further questions remain.

Related to the fact that MCV has not provided sufficient legal authority for the Court to conclude that METC cannot ultimately prove that the Facilities Agreement was filed to FERC's satisfaction, is the question of whether this Court should allow FERC the first opportunity to address that issue. Notably, it has not been adequately explained if there are FERC rules or orders that govern, or would help determine, whether the Facilities Agreement should be considered "filed." Additionally, could FERC waive the "prior notice" filing requirement under the circumstances of this case?[6] Even if FERC would now conclude that the Facilities Agreement should have been filed separately, did it advise METC otherwise in 2001, and could it now allow, or require, METC to file the agreement? If so, would the contract be enforceable as written, or would METC only be allowed to recover a cost-based rate?

Even if resolution of these questions does not fall within FERC's exclusive jurisdiction, the question is potentially referable to FERC under the "primary jurisdiction" doctrine. *See Nat'l Commc'ns Ass'n v. AT&T Co.*, 46 F.3d 220, 222-23 (2d Cir. 1995) ("The doctrine of primary jurisdiction allows a federal court to refer a matter extending beyond the 'conventional experiences of judges' or 'falling within the realm of administrative discretion' to an administrative agency with more specialized experience, expertise, and insight.") (quoting *Far East Conference v. United States*, 342 U.S. 570, 574 (1952)); *Arsberry v. Illinois*, 244 F.3d 558, 563-564 (7th Cir. 2001); *Reiter v. Cooper*, 507 U.S. 258, 268 (1993) (noting that when primary jurisdiction applies, a court "stay[s] further proceedings so as to give the parties reasonable opportunity to seek an administrative

_____

[6] *See generally* Jackie S. Levinson & Andrew D. Schifrin, *Regulatory & Tax Treatment of Electric Interconnection Facilities*, 23 Energy L. J. 459, 467-68 (2002) (explaining that many utilities did not file interconnection agreements until the last decade because of ambiguity arising from the question of whether "interconnection was part of transmission service").

ruling"). Whether a case involving energy contracts falls under FERC's primary jurisdiction depends on three primary factors:

> (1) whether [FERC] possesses some special expertise which makes the case peculiarly appropriate for [FERC] decision; (2) whether there is a need for uniformity of interpretation of the type of question raised by the dispute; and, (3) whether the case is important in relation to the regulatory responsibilities of [FERC].

*Ark. La. Gas Co. v. Hall*, 7 F.E.R.C. 61175, 61322 (1979).

Here, FERC may be in a better position to interpret its prior orders and rulings as they apply to the circumstances presented by the relationship and transfer of the Transmission Assets between Consumers and METC. FERC has been extensively involved in addressing what documents must be filed by jurisdictional entities and in determining the appropriate remedy if a document is not timely filed. Moreover, it is likely to be important that different entities are treated in a uniform manner under such circumstances. To ensure adequate consideration of whether this Court should defer to FERC, particularly to determine whether, or to what extent, the Facilities Agreement is enforceable, the parties will be directed to brief the issue.

B

Also in its motion to dismiss, MCV contends that METC lacks standing to pursue its claims against MCV because the Facilities Agreement imposes contractual obligations only as to Consumers and MCV. MCV asserts that there is no privity of contract between METC and MCV upon which METC has any rights to enforce MCV's contractual obligation to Consumers. MCV emphasizes that METC's complaint acknowledges that "the Facilities Agreement could not be assigned," Compl. ¶ 13, absent contemporaneous assignment of the PPA and MCV's consent. MCV highlights that the Agency Agreement between Consumers and METC recited that "Consumers has no desire to transfer the Power Purchase Agreement to METC." Agency Agmt. Intro. MCV

contends that METC and Consumers cannot circumvent the restriction on assignment through the Agency Agreement, citing, inter alia, *Ferndale Labs. Inc. v. Schwarz Pharma, Inc.*, 123 F. App'x 641 (6th Cir. 2005) (enforcing non-assignment clause that prohibited assignment without prior consent).

In response, METC contends that MCV has recognized the validity of the Agency Agreement from its inception by making payments to METC as required by the provisions of the Facilities Agreement for which METC was acting as Consumers' agent. METC further contends that MCV continues to recognize the validity of the agreement because it continues to request maintenance service directly from METC. METC asserts that the Facilities Agreement was not assigned, because METC was not made agent for the entire Facilities Agreement. Instead, METC only assumed certain rights and obligations, while other rights and obligations remained with Consumers.

METC asserts that "an agent may work on behalf of a principal within the scope of the agency agreement as if the agent had stepped into the shoes of the principal," quoting *PM One, Ltd. v. Dep't of Treasury*, 611 N.W.2d 318, 324 (Mich. Ct. App. 2000), and *Uniprop, Inc. v. Morganroth*, 678 N.W.2d 638, 641 (Mich. Ct. App. 2004). METC asserts that it is standing in the shoes of Consumers, seeking to enforce those aspects of the Facilities Agreement for which it has been named agent and, therefore, has standing to maintain its claims against MCV, citing *Grand Rapids Milk Producers Ass'n v. McGavin*, 295 N.W. 232 (Mich. 1940).

In addition, to the extent that the Agency Agreement can be characterized as an assignment, METC contends that MCV has waived its argument that the assignment is improper and is estopped from raising objections nine years after the agreement was executed when MCV has accepted and

continues to accept benefits from METC's performance. METC asserts that unlike the cases cited by MCV, wherein the courts upheld non-assignment clauses, here, the party challenging the assignment recognized it and acceded to its implementation, rather than bringing a timely action to enforce the non-assignment provision. METC specifically highlights *Board of Trustees of Mich. State Univ. v. Research Corp.*, wherein the court found that the plaintiff had "ratified the assignment by its conduct" of "continued performance under the Contract, even after it received notice of the assignment," and therefore "waived its rights to object." 898 F.Supp. 519, 522 (W.D. Mich. 1995).

In reply, MCV emphasizes that under the Facilities Agreement, it is only obligated to reimburse Consumers, not METC, for all direct and indirect costs and expenses incurred by Consumers resulting from its ownership and operation of the Connection Facilities. MCV asserts that it necessarily follows that, given Consumers' sale of the Connection Facilities to METC, Consumers could no longer incur costs and expenses, and therefore, METC has no claim to assert as an agent of Consumers. While taking this position, MCV does not address the fact that it executed amendments to the Facilities Agreement as recently as 2009, and nothing suggests that MCV negotiated those amendments with anyone other than Consumers or METC. In addition, there is no explanation as to why MCV, who has not made a payment under the Facilities Agreement since 2005, would be negotiating amendments to the agreement. As with the PPA, the parties have elected not to provide the effective version of the Facilities Agreement to the Court.

MCV also asserts that METC's reliance on *Board of Trustees of Michigan State University* is misplaced because the contract at issue did not contain a non-assignment provision. The court merely opined in dicta that it would have found a ratification of an assignment when there was "explicit disclosure of the assignment . . . and ratification of the assignment . . . by continued

performance under the Contract . . . and otherwise treating [the assignee] as though they were a party to the Contract." 898 F.Supp. at 522. MCV insists that METC has not advanced evidence to suggest that METC disclosed the assignment to MCV or that MCV ratified the assignment through its conduct.

At this juncture, METC's allegations suffice to demonstrate that MCV ratified the assignment of the Facilities Agreement through its conduct. This is true regardless of whether METC was acting as Consumers' agent or if Consumers effectively assigned the agreement to METC. In addition, if it were determined that the Facilities Agreement was adequately filed with FERC, but the Agency Agreement was, for some reason, unenforceable, it is plausible that an implied-in-fact contract could still exist between METC and MCV for the operation and maintenence of the Transmission Assets subject to the Facilities Agreement and Agency Agreement. *See, e.g.*, *Pacific Gas & Elec. Co. v. United States*, 87 Fed. Cl. 246, 248 (2009) (finding that FERC's approval of a filed tariff "did not automatically create a contract . . . but that genuine issues of material fact exist on whether the parties formed an implied-in-fact contract for the services that are the subject of the [t]ariff"). There are too many unanswered questions and ambiguities to conclude at this juncture that METC does not have standing to bring its claims against MCV.

## IV

Finally, turning to what is actually a threshold question, MCV asserts that federal question jurisdiction exists over this action pursuant to § 1331, which grants federal district courts jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." In general, the "well-pleaded complaint" rule is used to determine whether a complaint arises under federal law. *Loftis v. United Parcel Serv., Inc.*, 342 F.3d 509, 514 (6th Cir. 2003). Under this rule,

federal courts "examine the 'well pleaded' allegations of the complaint and ignore potential defenses." *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 6 (2003). Federal jurisdiction only exists if the plaintiff's complaint presents and properly pleads a federal question. *Caterpillar*, 482 U.S. at 392. Notably, the plaintiff is the "master of his complaint," and a defendant cannot "recharacterize" claims simply to remove a case to federal court. *Roddy*, 395 F.3d at 322 (quoting *Loftis*, 342 F.3d at 512).

Moreover, it is "settled law that 'a case may *not* be removed to federal court on the basis of a federal defense, including the defense of preemption, even if the defense is anticipated in the plaintiff's complaint, and even if both parties concede that the federal defense is the only question truly at issue." *Roddy*, 395 F.3d at 322 (quoting *Caterpillar*, 482 U.S. at 393) (emphasis in *Caterpillar*); *Beneficial Nat'l Bank*, 539 U.S. at 6. This is because preemption, when asserted as a defense, "does not appear on the face of a well-pleaded complaint and, therefore, does not authorize removal to federal court." *Roddy*, 395 F.3d at 322 (quoting *Metro Life Ins. Co. v. Taylor*, 481 U.S. 58, 63-64 (1987)). As a result, unless a federal statute completely preempts a state law cause of action, asserting the statute as a defense cannot serve as a basis for removal. *Roddy*, 395 F.3d at 323.

Here, MCV does not argue that "complete" preemption applies, nor that the "pre-emptive force" of the FPA is "so extraordinary that it converts an ordinary state commonlaw complaint into one stating a federal claim for purposes of the well-pleaded complaint rule." *Caterpillar*, 482 U.S. at 393 (quoting *Metro. Life*, 481 U.S. at 65). Rather, MCV contends that the "substantial federal question" and "artful pleading" doctrines establish federal jurisdiction. *See Mikulski v. Centerior Energy Corp.*, 501 F.3d 555, 565 (6th Cir. 2007) (explaining that "federal jurisdiction is unavailable

unless it appears that some substantial, disputed question of federal law is a necessary element of one of the wellpleaded state claims, or that one or the other claim is 'really' one of federal law") (quoting *Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 13 (1983)).

METC emphasizes that its complaint raises only state-law claims and contends that proving its claims will not require it to allege any federal claims. First, count one alleges unjust enrichment on the ground that MCV refuses to compensate METC despite the fact that it has received significant benefits from METC's operation and maintenance of the Connection Facilities. To prevail on a claim for unjust enrichment, METC must demonstrate that MCV received a benefit from METC that is inequitable for MCV to retain. *Keywell & Rosenfeld v. Bithell*, 657 N.W.2d 759 (Mich. Ct. App. 2002); *Computer Leasco, Inc. v. Volvo White Truck Corp*, 820 F.Supp. 326 (E.D. Mich. 1993). Similarly, count two alleges promissory estoppel, which requires METC to demonstrate that MCV made a promise to pay for the Connection Facilities' operation and maintenance, that promise induced Plaintiff's actions, and it would now be inequitable to allow MCV to avoid its promise. *See Charter Twp. of Ypsilanti v. GMC*, 506 N.W.2d 556 (Mich. Ct. App. 1993).

Next, count three alleges quantum meruit, which requires a defendant to pay the plaintiff for the reasonable value of services performed for the defendant, even though there was no express contract to do so. *Comber Tool & Mold Eng'g v. GMC*, 853 F. Supp. 238, 242 (E.D. Mich. 1993). Finally, counts four and five are for breach of a contract implied in fact and for breach of contract, respectively. To prevail on these counts, METC must prove that METC and MCV's conduct, language, actions, or other pertinent circumstances surrounding the transaction between them indicate that a contract exists. *R & D Distrib. Corp. v. Health-Mor Indus., Inc.*, 118 F. Supp. 2d 806

(E.D. Mich. 2000). In addition, a breach of contract claim requires METC to demonstrate that an agreement between the parties exists, the agreement required MCV to pay METC, and MCV refused to pay METC, thus causing injury. *See Burton v. William Beaumont Hosp.*, 373 F. Supp. 2d 707, 718 (E.D. Mich. 2005) (citing *Webster v. Edward D. Jones & Co., L.P.*, 197 F.3d 815, 819 (6th Cir. 1999)).

Based on the above characterization of its claims, METC asserts that there is no federal question presented on the face of METC's well-pleaded complaint. In particular, METC argues that the filed rate doctrine is merely a federal defense, which does not give rise to subject matter jurisdiction, citing *Entergy La., Inc. v. La. Pub. Serv. Comm'n*, 539 U.S. 39, 47 (2003), and *ABATE v. Mich. Pub. Serv. Comm'n*, 480 N.W.2d 585, 587 (Mich. App. 1992) ("The filed rate doctrine is a rule of federal preemption.").[7] While acknowledging that the Facilities Agreement may constitute the "filed rate," and therefore have the force of federal law, METC contends that is not enough to confer federal jurisdiction because it does not present a "substantial" federal question, citing *Mikulski*, 501 F.3d at 572 (concluding that a state law claim that required the interpretation of a federal tax statute as a vital part of plaintiff's claim did not raise a "substantial" federal question). By way of example, METC explains that a federal district court in the Western District of Michigan found that, although a claim involved the interpretation of a federal telecommunications tariff on file

---

[7] METC also argues that § 205 of the FPA does not completely preempt state law equitable and breach of contract claims. This argument need not be reached as MCV does not contend that "complete" preemption applies, or that the "pre-emptive force" of the FPA is "so extraordinary that it converts an ordinary state commonlaw complaint into one stating a federal claim for purposes of the well-pleaded complaint rule." *Caterpillar*, 482 U.S. at 393 (quoting *Metro. Life*, 481 U.S. at 65). Nor does MCV contend that 16 U.S.C. § 825p commits exclusive jurisdiction over breach of filed rate contracts to the federal courts. *See, e.g.*, *Pan Am. Petroleum Corp. v. Superior Ct. of Del.*, 366 U.S. 656 (1961) (finding that Delaware state court had jurisdiction to allow pipeline company to recover overpayments made to a natural gas producer even though some contracts were not filed with the Federal Power Commission).

with the Federal Communications Commission, the district court had no federal question jurisdiction over the claim. *Baraga Tel. Co. v. Am. Cellular Corp.*, 2006 WL 1982637, at *7 (W.D. Mich. 2006). The court reasoned that "[s]imply because federal law provides the framework in which a contractual relationship is established does not by itself make federal law a necessary element of a claim arising out of that contractual relationship." *Id.*

METC also emphasizes the Second Circuit Court of Appeals decision in *Fax Telecom. Inc. v. AT&T*, 138 F.3d 479 (2d Cir. 1998). There, the plaintiff filed a state breach of contract claim in state court based on an agreement that was not filed with the appropriate federal agency.[8] The Second Circuit explained:

> In the present action, Fax's breach of contract claim is based on an alleged contract - the unsigned letter of January 14, 1994 - that is independent of the rate on file with the FCC. Whether or not this contract exists or is enforceable, it is not the filed rate and therefore is not a simple creature of federal law. Although the filed rate doctrine provides a federal defense to the enforcement of this contract . . . Fax's state law breach of contract claim is not an artfully pleaded federal claim in disguise.

*Id.* at 487 (citations omitted).

In response, MCV contends that METC's state law claims necessarily raise "a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities," quoting *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005). MCV begins with the proposition that, if the Facilities Agreement has been approved by FERC, the Facilities Agreement is the filed rate, has the legal effect of a federal regulation, and gives rise to a substantial federal

---

[8] The filed rate doctrine, arising "out of deference to a congressional scheme of uniform regulation in order to avoid impermissibly usurping a function that Congress has assigned to a federal regulatory body . . . applies not only in energy regulation but in other industries in which filing of rates or tariffs is required by law." *Town of Norwood*, 23 F. Supp. 2d at 116, 116 n.6 (quotations and citations omitted).

question.  Alternatively, if the Facilities Agreement is not properly filed, and does not constitute the filed rate, the filed rate doctrine confers jurisdiction because METC is effectively seeking to invalidate the actual filed rate, which does not in fact exist.  MCV primarily relies on Fourth Circuit and Eleventh Circuit Court of Appeals decisions that may be somewhat at odds with the Second Circuit decision in *Fax.  See Bryan v. Bellsouth Comm. Inc.*, 377 F.3d 424 (4th Cir. 2004); *Hill*, 364 F.3d 1308.

First, in *Bryan*, the defendant removed a case to federal court, claiming jurisdiction under § 1331 by virtue of its reliance on the filed rate doctrine.  377 F.3d at 426.  The Fourth Circuit Court of Appeals affirmed the district court's denial of plaintiff's motion to remand because the claim at issue presented a substantial question of federal law when it "would require the court to determine a reasonable rate."  *Id.* at 430.  The plaintiff alleged that the defendant had failed to disclose certain information pertaining to the amount of a fee known as the "Federal Universal Service Charge" or "FUSC," charged by the defendant in violation of the state's unfair trade practices law.  *Id.* at 426.

Finding that federal jurisdiction existed, the court first noted that "a tariff filed with a federal agency is the equivalent of a federal regulation, and so a suit to enforce it, and even more clearly a suit to invalidate it as unreasonable under federal law arises under federal law."  *Id.* at 429 (quoting *Cahmann v. Sprint Corp.*, 133 F.3d 484, 488 (7th Cir. 1998)).  The court further emphasized that the filed rate doctrine serves two purposes: "to prevent discrimination among consumers and to preserve the rate-making authority of federal agencies."  *Id.* at 429.  Ultimately, the court was "constrained to agree" with the defendant's argument that because the plaintiff sought damages, if the plaintiff were successful, the court "would be put in the position of effectively refunding a portion of the FUSC" to the plaintiff.  *Id.* at 430.  The court emphasized that "[b]ecause the amount

of the FUSC is determinatively set forth in [the defendant's] tariff . . . an action seeking to alter that rate presents a federal question." *Id.* at 432.

Importantly, the dissent critiqued the majority decision on the ground that "the filed-rate doctrine is not coterminous with the scope of federal question jurisdiction under section 1331." *Id.* at 434. The dissent emphasized that "the filed-rate doctrine may be raised as a federal defense to a state law claim before a state court just as easily as before a federal court." *Id.* (citations omitted). As to the specific case before it, the dissent explained that "the court is not *necessarily* required to impose a different rate or to refund a portion of the rate in order to award damages to the plaintiff, as there are other viable theories of damages under the plaintiff's Complaint." *Id.* at 435. For example, any damages or "refund" awarded could be determined by reference to the defendant's misconduct and the plaintiff's reliance on that misconduct. *Id.* More specifically, "a plausible mechanism for determining damages that does not challenge the amount of the filed tariff [is] the difference between the [fee] charged by [the defendant] and the [fee] for the carrier that Plaintiff might have chosen absent [the defendant's] lack of disclosure." *Id.* at 436.

The Eleventh Circuit Court of Appeals reached a similar conclusion in *Hill*. *Hill* explained that "[t]he nondiscrimination principle explains why the filed rate doctrine bars any challenge that, 'if successful, would have the effect of changing the filed tariff.'" 364 F.3d at 1316 (quotation omitted). "Even if such a challenge does not, in theory, attack the filed rate, an award of damages to the customer-plaintiff would, effectively, change the rate paid by the customer to one below the filed rate paid by other customers." *Id.* (citations omitted). Thus, the court found that the plaintiff's fraud and negligent misrepresentation claims brought pursuant to the state unfair trade practices act raised a substantial federal question simply "because they implicated the filed rate doctrine." *Id.* at

1314-15. Significantly, the dissenting judge asserted:

> I think today's court extends the judge-made filed-rate doctrine too far: Congress intended not to remove from the states the power to prevent deceptive trade practices along the lines alleged by [the plaintiff] in her claims for violation of the [state unfair trade practices act] and for fraud and negligent misrepresentation.

*Id.* at 1317-18 (citing *AT&T v. Cent. Office Tel. Inc.*, 524 U.S. 214, 118 S. Ct. 1956, 1966-67 (1998) (Rehnquist, C.J. concurring) (asserting that the filed rate doctrine "does not serve as a shield against all actions based in state law").

As a further example, MCV cites *Marcus v. AT&T Corp.*, wherein the plaintiffs challenged removal to federal court, arguing that their state law breach of warranty claim did not arise under federal law. 138 F.3d 46, 52 (2d Cir. 1998). The court disagreed, relying on the artful-pleading doctrine. *Id.* at 55-56. The court noted that the plaintiffs sought to enforce the terms of agreements between AT&T and its customers. The agreements were filed tariffs, and thus, the plaintiffs' claims "necessarily raise[d] a substantial federal question over which federal courts may properly exercise jurisdiction." *Id.* at 56; *see also Cahnmann v. Sprint Corp.*, 133 F.3d 484, 488 (7th Cir. 1998) (state law claims to enforce a tariff filed with a federal agency arise under federal law).

METC asserts that *Hill* and *Bryan* are distinguishable from the instant case because the plaintiffs in those cases sought damages that would have amounted to refunds of approved rates – in *Hill*, the court would have had to determine that the rate filed with the FCC "was unreasonable," 364 F.3d at 1317, and in *Bryan*, the court would have had to "alter" the defendant's filed tariff, 377 F.3d at 432. METC does not explain, however, the significance of these distinctions to the issue of whether its claims raise a "substantial federal question."

MCV also contends that METC's reliance on the FERC Prior Notice Order, and the 2001 FERC order approving the transfer of assets from Consumers to METC, underscores the way in

which METC's claims depend on the resolution of federal issues. If the Court finds that the 2001 FERC order did not constitute a filing of the Facilities Agreement, it will be required to interpret and apply the Prior Notice Order, not only to gauge whether it enables METC to avoid the filed rate doctrine, but also for the purpose of calculating damages. MCV asserts that the necessity of examining and enforcing two FERC orders and two FERC jurisdictional contracts belies METC's argument that none of the claims asserted substantially rely on federal law.

MCV's position is persuasive. In this case, the filed rate doctrine is not only a federal defense, but raises the substantial question of whether the Facilities Agreement was properly filed. Answering this question requires the interpretation of FERC orders and rules, and does not appear to have a simple answer. In addition, if it is concluded that the Facilities Agreement provides the "filed rate," METC's claims to enforce the agreement arise under a federal law, because the filed rate is tantamount to a federal regulation. *See, e.g.*, *N.Y. State Elec. & Gas Corp. v. N.Y. ISO, Inc.*, No. Civ.00-CV-1526HGMGJD, 2001 WL 34084006, at * 6 (N.D.N.Y. Jan. 19, 2001 (concluding that filed tariffs "assume the mantel of federal law by virtue of their filing with FERC," and that "the conclusion that federal subject matter jurisdiction exists and the action was properly removed seems inevitable" when the plaintiff brought state law claims relating "to the rights and duties of each party described in agreements that are incorporated into tariffs filed with FERC").

## V

Accordingly, it is **ORDERED** that Defendant MCV's motion to dismiss [Dkt. # 2] is **DENIED**.

It is further **ORDERED** that Plaintiff METC's motion to remand [Dkt. # 7] is **DENIED**.

It is further **ORDERED** that Plaintiff's motion to stay [Dkt. # 8] is **DENIED AS MOOT**.

It is further **ORDERED** that the parties are **DIRECTED** to file briefing as outlined in this opinion. Each party shall file a brief, no longer than **twenty pages** on or before **September 8, 2010**.

Each party may file a response brief, no longer than **ten pages**, on or before **September 22, 2010**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: August 25, 2010

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on August 25, 2010.

s/Tracy A. Jacobs
TRACY A. JACOBS